# EXHIBIT D

Ice King Enterprises, LLC dba
Ice King Music
218 35th Street
Richmond, California 94805

Dated as of October 31, 2011

Mr. Rayven Justice
1323 MacArthur Boulevard
Apartment 5
Oakland, California 94606

RE: Ice King Enterprises, LLC dba Ice King Music ("Company") -w- Rayven Justice ("Artist") / Exclusive Recording Agreement

Dear Mr. Justice:

This agreement sets forth the material terms wherein Company shall, subject to the condition precedent as set forth below, accept such engagement and delineate the terms of an exclusive recording agreement between Artist and Company wherein Artist shall furnish to Company Artist's exclusive recording services (the "Agreement"). For good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged by Artist), the terms are as follows:

1. **Termination of Prior Agreement:**

Simultaneously with the execution of this Agreement, the agreement between Company and Artist entered into on October 19, 2011 shall be terminated and all parties thereto shall be deemed to have fully performed thereunder.

2. **Term, Product Commitment and Territory:**

(a) One (1) album (the "Initial Contract Period"), plus four (4) option(s) ("Option Period(s)") each for one (1) album which embodies Artist's recorded performance (the "Product Commitment"). The Initial Contract Period and each Option Period are also referred to herein as a Contract Period. Notwithstanding the foregoing, during the Initial Contract Period, Artist shall, at Company's expense, record such number of "demonstration" recordings embodying Artist's performances ("Demo(s)") requested by Company, be available for personal auditions and do those things reasonably related to securing a Distribution Agreement with a Distributor. Distributor shall be defined as a record company which has the right to distribute records derived from the master recordings recorded hereunder pursuant to a Distribution Agreement. In the event Company has failed to enter into a Distribution Agreement furnishing the services of Artist under the Agreement within twenty-four (24) months from execution of this Agreement, Artist may terminate the Agreement by written notice to Company.

(b) With the exception of the Initial Contract Period, but subject to the other provisions of this Agreement, each subsequent Contract Period shall automatically commence on the date following the date of expiration of the immediately preceding Contact Period and shall continue until the later of the date nine (9) months after the commercial release of the Product Commitment for such Contract Period.

(c) The Territory shall be the Universe.

3. **Advances and Royalties:**

(a) Conditioned upon Artist's full performance of all of the terms and conditions of this Agreement,

1

Company shall pay (or cause to be paid) to Artist the following amounts of Net Advances and Royalties (as defined below):

| Albums | Artist Advances and Royalties |
|---|---|
| First and Second | 50% |
| Third and Fourth | 55% |
| Fifth | 60% |
| Subsequent Albums, if applicable | 70% |

"Net Advances and Royalties" means the gross advances and royalties actually received by Company from the Distributor in accordance with the Distribution Agreement that relate solely to Artist's services as a recording artist pursuant to the Distribution Agreement less: (i) all recording costs, video production costs, tour support payments, audition costs, all costs paid or incurred by Company or Artist in connection with any search or registration in respect of any trademark, name or sobriquet now or hereafter used or proposed to be used by Artist under this Agreement, payments required by law, payments to third parties (including without limitation, producer and side artist fees and royalties), and any other costs or expenses incurred by Company in connection with the production, promotion, or exploitation of recordings hereunder or in the furtherance of Artist's recording career; and (ii) the costs incurred by Company in connection with the procurement and negotiation of a Distribution Agreement and the collection and receipt of Net Advances and Royalties (e.g., legal and accounting fees). For the avoidance of doubt, Artist shall not be entitled to receive any monies that are credited to Company's royalty account by Distributor in connection with the recoupment of chargeable costs. For the further avoidance of doubt, in the event that Company is not subject to a Distribution Agreement or Successor Distribution Agreement (as defined below) (whereby Company is furnishing Artist's services to a Distributor) and Company is credited monies for the commercial exploitation of Demos or other master recordings recorded and owned by Company pursuant to this agreement (i.e. synchronization license) at the time that Company is not subject to a Distribution Agreement or Successor Distribution Agreement (whereby Company is furnishing Artist's services to a Distributor), then Company shall be entitled to recoup "off the top" one hundred percent (100%) of any expenditures made by Company on behalf of Artist.

(b) Artist will not be entitled to additional payment as a musician, engineer, background vocalist, producer or co-producer of master recordings hereunder.

(c) The amounts payable to Artist hereunder shall include all royalties due to Artist or any person deriving rights from Artist from the exploitation of master recordings hereunder. Any royalties which Company pays (or causes to be paid) to any such person in consultation with Artist shall be deducted from royalties payable to Artist hereunder. Notwithstanding the foregoing, royalties payable to producers, mixers and re-mixers of master recordings recorded hereunder with Company's consent, and royalties payable to other third parties with Company's consent, shall be borne by Artist and Company proportionately in accordance with Artist's and Company's respective share of Net Advances and Royalties (i.e. such payments shall be borne "off-the-top").

(d) It is expressly understood and agreed that any and all Advances paid by Company pursuant to the terms of this paragraph 3 shall specifically include the prepayment of session union scale, as provided in the applicable union codes, and Artist agrees to complete any documentation required by the applicable union to effectuate the terms of this sentence.

4. **Mechanical Royalties:** All compositions embodied in a master recording which are written or owned, in whole or in part, by you or any entity owned or controlled by you are referred to as "Controlled Compositions". For all Controlled Compositions, Company shall pay copyright royalties on the basis of a rate equal to three-fourths (3/4) of the minimum fixed statutory copyright rate (determined as of a timely delivery) for full-priced net sales, subject to a maximum of 10x such rate for each album.

5. **Distribution Agreement:**

(a) Artist shall comply with all of the terms and conditions as may be set forth in any Distribution Agreement including, without limitation, re-recording restrictions; video production; commitment and exploitation; and provisions concerning promotional activities.

(b) From time to time, Company shall have the unrestricted right (but not the obligation), in Company's sole election, to conform any one or more provisions (e.g., definitions, reserves, free goods, term, Product Commitment, etc.) of this Agreement to the Distribution Agreement and "pass-through" the applicable terms and conditions contained in the Distribution Agreement and Artist agrees to be bound by the conformed provisions. In the event of any inconsistency between the definitions herein and the definitions contained in the Distribution Agreement, then the definitions of the Distribution Agreement shall control. Any terms defined in the Distribution Agreement which are not defined herein shall have the same meaning as in the Distribution Agreement.

(c) In the event the Distribution Agreement entered into by Company contains or provides for additional rights to the benefit of the Distributor for the entire agreement or for an individual Contract Period which are beyond and greater than the grant of rights and terms and conditions set forth herein, then the terms and conditions of the Distribution Agreement shall control.

(d) If the Distribution Agreement expires or terminates prior to the date on which this Agreement would otherwise expire if all options hereunder were exercised, then the Term shall automatically be deemed extended for a period (the "Extension Period") commencing upon such expiration or termination of the Distribution Agreement and extending until the date on which Company enters into a new Distribution Agreement (a "Successor Distribution Agreement"). Notwithstanding the foregoing, any Extension Period shall not continue for more than nine (9) months, provided that Artist shall cooperate with Company, at Company's request, for the recording of additional Demos or master recordings or the performance at auditions, for use in securing a Successor Distribution Agreement. All references in this Agreement to "Distribution Agreement" shall apply to any Successor Distribution Agreement. In the event the Successor Distribution Agreement entered into by Company contains or provides for additional rights to the benefit of the Distributor which are beyond and greater than the grant of rights and terms and conditions set forth in the Distribution Agreement, then the terms and conditions of the Successor Distribution Agreement shall control and apply during the term of the applicable Successor Distribution Agreement.

(e) Artist will sign any inducement letter or similar document required by Distributor as a guarantee that Artist will meet his obligations under this paragraph. In the event that Artist shall fail or refuse to execute any such letter of inducement or other documents within seven (7) days after Company request that Artist do so, Artist hereby appoints Company as his true and lawful attorney-in-fact to execute such letter of inducement in his name and on his behalf in the event he fails to sign within the time prescribed. Such power of attorney is irrevocable and is coupled with an interest.

6. **Creative Control:** All creative decisions, including, without limitation, selection of producers and studios, as well as the selection of budgets associated with any of the above, shall be determined by Company in consultation with Artist. Company shall have the exclusive right to use Artist's name for websites relating to Artist's activities in the music industry. Company shall also have the right to use Artist's name in URLs and to control any URLs which incorporate Artist's name. Artist shall have the right to approve the look and feel of websites that pertain primarily to Artist; Artist will not unreasonably withhold his approval.

7. **Co-Publishing and Exclusive Administration:**

(a) Artist hereby assigns to Company an undivided fifty percent (50%) interest in the worldwide copyright (and all renewals and extensions thereof) and all other rights in and to all musical compositions written, owned, controlled and/or acquired by Artist and/or Artist's affiliate(s), in whole or in part, in connection with the master recordings delivered to Company hereunder (the "Controlled Compositions")

3

for the full duration of the copyright therein, including any renewals and/or extensions thereof. Company shall be the exclusive administrator of one hundred percent (100%) of each party's rights in and to all such Controlled Compositions. The foregoing rights with respect to the Controlled Compositions shall be collectively referred to herein as the "Publishing Rights."

(b)     From all royalties earned and received by Company in the United States from the exploitation of such Controlled Compositions (the "Publishing Gross Receipts"), Company shall: (i) deduct and retain all out-of-pocket costs incurred by Company in connection with the exploitation, administration and protection of such Controlled Compositions (if any); (ii) deduct and pay royalties payable to the writers of such Controlled Compositions (which Artist represents and warrants shall not exceed fifty percent (50%) of the Publishing Gross Receipts); and (iii) pay to Artist an amount equal to fifty percent (50%) of the balance remaining after deducting the aggregate advances set forth in this paragraph 7, and the remaining fifty percent (50%) thereof shall be retained by Company for its sole use and benefit.

(c)     Company shall have the right to assign its rights in and to the Controlled Compositions, including, without limitation, to its publishing affiliate.

8.     **Merchandising Rights:** During the Term hereof, Artist hereby grants to Company the exclusive right to manufacture and sell products that embody Artist's name and/or likeness ("Merchandising Rights"). Company shall credit Artist's royalty account with twenty five percent (25%) of Company's Net Receipts, if any, from the sale of merchandise embodying Artist's name and/or likeness. As used in this paragraph, the term "Net Receipts" shall be defined as gross receipts, less actual manufacturing costs (including the cost of goods), sales tax, shipping costs, credit card processing fees, actual marketing costs and actual adjustments and discounts.

9.     **Ancillary Entertainment Rights:** For contracts entered into during the Term of the Agreement and for nine (9) months after the Term of the Agreement, with respect to all entertainment activities which typically fall outside the scope of a recording agreement, such as Artist participation in film, television, touring, acting, sponsorship, clothing lines, books and endorsements, Artist shall pay (or Artist shall designate to pay) to Company fifteen percent (15%) of gross monies (in whatever form) received by Artist in connection with the foregoing activities. Company shall have the right to receive its share of gross monies the later of: (a) five (5) years after the termination or expiration of Term of this Agreement; or (b) the date the Distributor shall cease to receive ancillary income (if applicable).

10.     **Grant Of Rights:**

(a)     All recordings (excluding the copyrights in and to the underlying compositions) and videos made by Artist hereunder shall be exclusively owned by Company, and shall be "works for hire" for Company and Company's licensees within the meaning of the U.S. Copyright Law. Company and any person authorized by Company shall have the right, to reproduce, print, publish or disseminate in any medium Artist's name, approved portraits, approved likenesses and approved biographical material concerning you, as news or information, or for the purposes of advertising, promotional and trade in connection with the manufacture, sale, marketing and distribution of master recordings and videos made hereunder. You shall have the right to approve the portraits, pictures, likenesses and biographical material pertaining to you. Such approval shall not be unreasonably withheld and shall be given to Company within five (5) days after such material is made available to Artist for approval. Artist's failure to give notice of approval or disapproval within such time period shall be deemed approval of the material. During the Term, Artist shall not authorize any person other than Company to use Artist's name or likeness in connection with the advertising or sale of phonograph records. As used in this Agreement, the word "name" shall include any professional names or sobriquets used by Artist.

(b)     Company may assign this Agreement to the Distributor, a licensee or to any subsidiary, affiliated or controlling corporation, or to any person owning or acquiring a substantial portion of the stock or assets of Company.

11.     **Notice:** All notices to be given by either party hereunder shall be in writing and shall be delivered

by hand or by United States certified mail, postage prepaid, return receipt requested, to the address of each party as first set forth above until notice of a new address shall be duly given, except that royalty statements and any payments due hereunder, shall be sent to Artist at such address by regular mail. A copy of all notices to Company shall be sent to Plummer Law Group, PC, 14724 Ventura Boulevard, Penthouse, Sherman Oaks, California 91403, Attn: Tabetha D. Plummer, Esq.

12.  **Minimum Compensation:** Company guarantees to compensate Artist for his exclusive services hereunder at the rate of not less than Nine Thousand Dollars ($9,000.00) for the first fiscal year of this Agreement or such other sum as may be required during subsequent Contract Periods to satisfy provisions relating to injunctive relief under Section 3423 of the California Civil Code and Section 526 of the California Code of Civil Procedure.

13.  **Miscellaneous:**

(a)  Subject to the terms and conditions as set forth in paragraph 1 above, Artist warrants and represents that Artist is free to enter into this Agreement and is not restricted in any manner from performing under this Agreement. Artist agrees to and does hereby indemnify, save and hold Company harmless of and from any and all liability, loss, damage, cost or expense (including outside attorneys' fees) arising out of or connected with any breach or alleged breach of this Agreement or any claim which is inconsistent with any of the warranties or representations contained in this Agreement, and Artist agrees to reimburse Company on demand for any payment made or incurred by Company with respect to any of the foregoing. Pending final determination of any claim involving such alleged breach or failure, Company may withhold any sums due to Artist.

(b)  It is intended that this short form Agreement will be replaced by a more formal document following the execution hereof, if in the event the condition precedent is fulfilled; however, but unless and until such time, this Agreement shall represent the agreement between the parties. Upon the execution of this Agreement by all parties, all of the provisions of this Agreement shall be binding upon the parties. This Agreement sets forth the entire understanding of the parties hereto; all oral or written agreements or representations, express or implied, with respect to the subject matter of this Agreement are set forth herein. All prior employment agreements, understandings and obligations whether written, oral express or implied between Artist and Company are terminated as of the commencement date of this Agreement. While it is the intention of the Company to issue a more complete agreement, this document shall be deemed the full understanding of the material terms of the agreement between Artist and Company. The definitions, terms and provisions set forth in Company's standard exclusive artist agreement will otherwise be applicable to Company's agreement with Artist, subject to good faith negotiation befitting an artist of Artist's stature.

(c)  No provision of this Agreement may be amended, modified, waived, or discharged except by a written document signed by Artist and Company. A waiver of any conditions or provisions of this Agreement in a given instance will not be deemed a waiver of such conditions or provisions at any other time.

(d)  Artist understands that Artist has the right to seek the advice of independent counsel concerning Artist's rights, the provisions hereof, and the advisability of executing this legally binding letter agreement. Further, Artist acknowledges that Company has advised Artist, and given Artist the opportunity, to seek the advice of independent counsel, and Artist acknowledge that Artist is executing this letter agreement voluntarily after consultation with independent counsel or intentionally deciding not to seek advice of independent counsel.

(e)  This Agreement shall be governed by the laws and adjudicated in the State of California without regard to laws pertaining to choice or conflict of laws of said state. It shall be binding upon the parties, their representatives, executors and successors. This Agreement may be executed in one (1) or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one (1) and the same instrument. Signature via facsimile or electronic mail as a "PDF" shall have the same force and effects as an original signature in ink.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on or about the day and year first above written.

Ice King Enterprises, LLC dba
Ice King Music

By: _____
An Authorized Signatory

ACCEPTED AND AGREED TO:

_____
Rayven Justice

6